KATHERINE HUNT, ET AL. v. HORACE TOLLES, ET AL.

May Term, 1901.

Present: ROWELL, TYLER, MUNSON, WATSON and STAFFORD, JJ.

Opinion filed August 28, 1902.

*Cemeteries—Dedication—Evidence—Control— Deed— Sufficiency of designation of grantee—Inhabitants of school district—Defacement of cemetery—Damages.*

Evidence that strips of land, adjoining a cemetery granted by deed, were added thereto by moving out the boundary walls and extending them to complete the enclosure, and that thereafterwards lots were taken and interments made in such additions the same as in the original cemetery, is sufficient to show a dedication of the additional land to the purpose of the original grant as shown by the deed thereof.

A deed of land for cemetery purposes made to the "inhabitants" of certain school districts, the districts as such being incapable of receiving the land for such purposes, is too indefinite to confer any title on such inhabitants as individuals; but it creates a trust which the court of chancery will protect by the appointment of a trustee to control the same, unless the control is placed elsewhere by statute.

Such a deed, though invalid, will determine the scope of the dedication, and will prevent the cemetery from being a public one within the meaning of the statute.

Under such a deed, individuals to whom particular lots in the cemetery have been assigned, cannot acquire such an interest in or control over such lots as will give them the right to deface the same.

APPEAL IN CHANCERY.   Heard on the report of a special master and the orators' exceptions thereto at the December Term, 1900, Windsor County, *Start,* Chancellor, presiding. Decree dismissing the bill.   The orators appealed.

*Wm. P. Dillingham* and *Gilbert A. Davis* for the orators.

The circumstances under which the additions to the cemetery were made, including the fact that the several additions were owned by descendants of Consul Jarvis, clearly indicate a dedication of the same to the purposes specified in the original grant.

The school districts had no power to hold land for burial purposes. The selectmen had no authority over this cemetery because it did not become a public one. The grant to the "inhabitants" is too indefinite; yet a court of equity will not allow the gift to fail, but will appoint a trustee. *Montpelier* v. *East Montpelier*, 29 Vt. 12; *Peter* v. *Beverly*, 10 Pet. 532; *Tucker* v. *Society*, 7 Met. 188; *Burbank* v. *Whiting*, 24 Pick. 146; *Winslow* v. *Cummings*, 3 Cush. 358; *Vidal* v. *Girard*, 2 How. 187; *Burr* v. *Smith*, 7 Vt. 241; *Clement* v. *Hyde*, 50 Vt. 716; *Mann* v. *Met. Ep. Ch.*, 27 N. J. Eq. 47.

The good faith of the defendants will not avail against these proceedings.

*J. C. Enright, E. R. Buck* and *William Batchelder* for the defendants.

Whatever the effect of the original grant may have been, the additions to the cemetery constituting a considerable part of the same must be held to be a public cemetery by dedication, and under control of the selectmen. In fact the defendants claim the whole cemetery is a public cemetery. Beach on Trusts, s. 555. And being such came under the care of the selectmen. V. S. 3583, 3584; *Pierce* v. *Spafford*, 53 Vt. 394.

An injunction will not lie to restrain an administrative officer from performing his ordinary official duties. Thorp on Public Officers, s. 559, and cases. The work complained of was done under the direction of Wilson acting for the board of selectmen. And having been done in good faith and for the

very purpose of improving the appearance of the cemetery, is beyond the reach of this proceeding.

MUNSON, J.   On the fifteenth day of September, 1813, William Jarvis, of Weathersfield, better known as Consul Jarvis, conveyed "to the inhabitants of the Third and Fourth School Districts in the town of Weathersfield, their heirs and assigns forever," certain land in the town of Weathersfield, to be held by them "the said inhabitants of said districts their heirs, administrators, executors and assigns," so long as the same should be improved for the sole purpose of a burying-ground; reserving to himself and his heirs, executors, administrators and assigns, a lot three rods square near the center of the land described.   Consul Jarvis was a resident of the Fourth District, and the land conveyed was in the same district, about a fourth of a mile from his house.   A plat of ground, appropriated in the life time of Consul Jarvis, but differing in size and location from the reservation, has been used as the family lot.   The remains of Consul Jarvis, of his son Major Charles Jarvis, and of other members of the family, rest in this lot, surrounded by the graves of their neighbors who have been buried there from time to time since the deed was given.   The bill is brought by a daughter and grand-daughters of Consul Jarvis, who are inhabitants of the Fourth District, in behalf of themselves and any others, inhabitants or heirs, who may desire to be joined, and alleges a defacement of the cemetery by the improper cutting of trees and shrubbery, and prays that all further cutting be enjoined, and that the defendants be ordered to pay such sum as will restore the cemetery as nearly as possible to its former condition, and for such other and further relief as the court can give.   The defendants are the first selectman of Weathersfield and persons who acted under him in doing the work complained of, most of whom were inhabit-

ants of said districts, and had relatives buried in the cemetery. The answer alleges that the cemetery had been almost entirely neglected for many years, and had become unsightly from an overgrowth of trees and bushes, and that the work in question was undertaken at the request of the inhabitants of said districts, and was intended to improve and beautify the cemetery.

Speaking generally, the cemetery lies in the angle formed by the intersection of the turnpike and the road leading west from the turnpike to Jarvis' mills. The description in the deed begins at a stake in the north side of the road about ten rods west of the turnpike, and continues by courses and distances without further mention of existing boundaries,—the first course being to the west. The line returning to the first bound runs along the top of a bank at the bottom of which the turnpike is located. In 1850 Consul Jarvis deeded to some grandsons a tract of land which, as described, surrounded the cemetery, reserving the use of it during his life. In 1865, which was after Consul Jarvis' death and while the title was in some of his descendants, strips adjoining the cemetery on the east, west and south were added to it by moving out the boundary walls and extending them to complete the enclosure. The addition on the east included the bank just referred to. Since then lots have been taken and interments made on these additions, the same as upon the original grant. Nothing further appears in regard to this enlargement. We think the findings are sufficient to show a dedication of this additional land to the purpose to which the original grant was devoted by the terms of Consul Jarvis' deed, and that no distinction should be made between the original cemetery and the additions as regards title or control.

It does not appear that any one claimed or assumed control of the cemetery, nor that there was any supervision of it, prior to 1866. At a meeting of school district number Four,

held in March of that year, one Haskell was elected sexton "as far as the district had the right to," and this choice was ratified later in the year at an informal meeting held in the cemetery and participated in by persons who had been engaged in making the improvements hereafter referred to.     Mr. Haskell served as sexton until 1884, when he was succeeded by Henry W. Sheldon, as to whose authority nothing appears.     Sheldon served until about 1890, and was then succeeded by Sylvester W. Jones, who has since acted.     It appears from parol evidence that Jones was elected sexton at a meeting of district number Four, but there is nothing regarding an election in the records.     He has had no other appointment.     The town has never chosen cemetery commissioners, and no vote of the town in regard to this cemetery is shown.     The selectmen had a meeting in October, 1898, when the necessity of clearing up this and other cemeteries in the town was discussed.     This meeting was attended by defendant Wilson and another member of the board, the third member having been duly notified. The result of this meeting was an understanding that Wilson should proceed and do the work as he thought proper.     He thereupon caused to be read from the pulpit of the church in the neighborhood of the cemetery, at a regular Sabbath service, a notice requesting those interested in the improvement of the cemetery to meet at the cemetery for that purpose.     The acts complained of were done by those who assembled in pursuance of this call.

Very little is shown as to the care and condition of the cemetery during the first forty years of its existence.     It may be inferred from the fact that Consul Jarvis himself occasionally turned sheep into it to be held for washing in the river near by, that not much had been done for its improvement or ornamentation.     In 1865, it was largely overgrown with bushes and small trees.     At this time Mrs. Richards, a daughter of

Consul Jarvis, inaugurated a movement for its improvement, and secured assistance in money and team-work from the people of the two districts generally.   The bushes and small trees were cut, the grounds graded, drive-ways laid out, and a suitable entrance erected.   Fir-trees, pines and maples were procured and set out in suitable places.   The trees removed by the defendants from the interior of the cemetery were mostly trees set out or selected for preservation at this time.

From 1866 to 1898, there was no systematic care of the grounds.   Some lots were partially cared for, and some grass and bushes were cut annually by the sexton and volunteer assistants.   Occasionally a tree was cut by the owner of the lot upon which it stood.   Sometimes, before a funeral, drooping limbs that interfered with the driving of carriages to the grave were cut away.   But this work accomplished little towards keeping down the growth, and in 1898 there was great need of a judicious thinning and trimming in the interior of the cemetery.   The steep bank which descends to the highway from the easterly edge of the platted portion of the cemetery was at this time covered with a dense growth of trees and underbrush.

At the time appointed defendant Wilson and about twenty others met at the cemetery, looked the place over, and had some general discussion as to what had better be done.   Mr. Wilson then arranged with two men to clear the east bank and clean it up properly; directed that no trees should be cut on the Jarvis lot, nor on any lot that was cared for by the owner, nor on any other lot against the known wishes of those interested, nor where there was danger that the falling would injure a stone, nor in the south row of trees; and placed some restrictions upon the trimming of a few trees in the south-east corner; but beyond this directed them to use their own judgment, and to cut trees

in the interior as they thought best, even if it took them all.
He left the cemetery after being there about two hours, and
the work was then taken up and carried on in his absence, and
without anyone having special charge or direction. The mas-
ter finds that all the defendants acted in good faith and for the
purpose of improving the cemetery.

It appears that thirty-five trees in the platted portion of
the cemetery were cut, most of them maple, pine and hemlock.
Of these, twenty-two were trees set out or intentionally left
standing in 1865. The northerly part of the wooded bank was
entirely cut over before the work was stopped. The master has
not undertaken to pass judgment upon the propriety of these
cuttings, but has submitted a somewhat detailed statement of
matters bearing upon the issue. It is not likely, however, that
the most complete description would enable the court to speak
with certainty regarding the desirability of all that was done.
It is evident that in the case of large-growing trees the lapse
of twenty-five or thirty years might convert what was at first
a suitable ornamentation of the platted ground into an exces-
sive and injurious growth. On the other hand, it may well be
supposed that a work of reduction, undertaken and carried on
as this was, would be done without much discrimination. In
fact, it specifically appears that one tree was cut on the Jarvis lot
notwithstanding the restriction imposed by the selectmen. The
clearing of the easterly bank was apparently undertaken with-
out any conception of the possibilities that lie in the manage-
ment of a wooded slope bordering the platted portion of a ceme-
tery. In view of the difficulty of judging correctly as to the
details of the work, and the difference in taste regarding the
desirability of trees in the part devoted to interments, the court
cannot well go farther in characterizing the acts of the defend-
ants. It is certain that the harm done, whatever its exact
limit, can be remedied only by competent management in the

future, aided by the healing hand of time; and it becomes our further duty to inquire whether there is any legal method by which this gift of an honored citizen for the benefit of his neighborhood may be conserved and perpetuated.

The deed is to the inhabitants of the Third and Fourth school districts and their heirs and assigns. The districts were incapable of taking land for the purpose named, and it is not necessary to inquire what words are essential in conveying to a corporation. If there was any conveyance here it was to the inhabitants of the two districts as individuals, and the question arises whether there was an adequate designation of grantees. It is well settled that grantees may be sufficiently indicated without using their names. It may be done by any description that will distinguish them from all others. Thus, a grant to the children of A is sufficient. But designations other than by family relationship are looked upon with less favor. A grant to "the owners * * of the brick house and curtilage adjoining the property hereby conveyed on the west side thereof" was held insufficient. *Schaidt* v. *Blaul,* 66 Md. 141, 6 Atl. 669. It is said in Co. Lit. 3a, that a grant to the parishioners or inhabitants of Dale, or to the commoners of a certain waste, is void for uncertainty. But it is said in 2 Wash. Real Prop. 588, that while a grant to the inhabitants of a neighborhood which is not determined by ascertained limits would be void, one made to the inhabitants of an unincorporated but certainly defined district might pass an estate to its then residents.

Descriptive designations of this character are sustained upon the principle that that is certain which may be made certain. But it is obvious that there must be a limit to the application of this maxim short of absolute impossibility. Theoretically, much may be made certain that in practice must remain unascertained. The doctrine stated must be kept within reasonable limits, however difficult it may be to draw the line of

demarcation. The law must recognize the necessity of having certainty without undue expense. The ascertainment of a hundred persons, men, women and children, who were inhabitants of a certain district on some given day, may not be beyond the reach of effort and expenditure, but it is something that cannot reasonably be required. We are not disposed to sustain a grant made to an aggregation of people designated by municipal limits.

This leaves the heirs of the inhabitants of 1813 without title, but does not leave the court without power to preserve the interests which the deed of 1813 was designed to establish and perpetuate. A deed which assumes to convey property to a public use, but passes no legal estate because of the inability of the grantee to take or the failure to name a grantee, creates a trust which the court of chancery will protect by the appointment of a trustee. *Bailey* v. *Kilburn,* 10 Metc. 176, 43 Am. Dec. 423. In *Greene* v. *Dennis,* 6 Conn. 293, 16 Am. Dec. 58, where a devise was held void because the association was not a corporation, and the members were not so designated as to take as individuals, it was intimated that, if the application were to the court in chancery, a different result might be secured. In *Beatty* v. *Kurtz,* 2 Pet. 566, 7 L. Ed. 521, a lot had been marked "for the Lutheran church" in the original plan of an addition to Georgetown, and had afterwards been used by the Lutherans of that town as a place of burial, with the acquiescence of the donor. There was no church organization of any kind at the time of the appropriation, and afterwards only a voluntary association without corporate powers. The court considered that, if the appropriation were to be deemed of any validity, it must be upon principles other than those that ordinarily apply between grantor and grantee, and sustained it as a dedication of the lot to public and pious uses.

The deed executed by Consul Jarvis is invalid; but the facts remain that the grantor and his descendants have recognized and asserted the appropriation, that the inhabitants of the two districts have used the ground and attempted to care for it, and that three generations of their dead lie buried there. The authorities above cited are sufficient to show that the making of some adequate provision for the control of a cemetery thus circumstanced, is within the power of the court of chancery, unless the control is placed elsewhere by statute. -

The statute puts public burial grounds in charge of the selectmen or cemetery commissioners, and this cemetery would doubtless be within the provision if the act of Consul Jarvis were held to be a dedication to the general public without limitation as to the management.   V..S. 3583, 3584, 3589; *Pierce v. Spafford,* 53 Vt. 394.   But though the deed is invalid, it is the written evidence which must determine the scope of the dedication, and it discloses an intention to give the control to the inhabitants of the two districts.   In one part of the deed, the grantor speaks of the property as the "district's land."   It may be that the appropriation did not contemplate any restriction as to interments, but more than this is required to make a burial-ground public within the meaning of the statute.   The statute itself provides that the sections above cited shall not apply to a burial-ground which is subject to other control than that of the selectmen or cemetery commissioners.   The care of this cemetery was committed by the dedicatory act of its donor to a community other than the town, which community is incapable of executing the trust, and equity will effectuate the purpose of the donor by the appointment of trustees.

It is not necessary to distinguish between the defendants in respect to their relations to the cemetery or the part which they took in the work.   They were all there for a common purpose, which embraced the renovation of the entire ground, and

each must be held to have had a part in all that was done. They were all acting under the directions of the first selectman, who was acting in his official capacity, with mistaken views as to his authority. No effect can be given to the fact that some of the defendants belonged to families to which particular lots had been assigned. It was impossible to acquire any interest in or control over individual lots that could be asserted against this proceeding; and if it had been possible, such an interest or control could not have justified all that was done. It is not necessary to the disposition it is proposed to make of the case that there be a more definite ascertainment of the damage. In view of the finding that all were acting in good faith, and of the difficulty of determining just how much of the work was injurious, and of the impossibility of rectifying a mistake of this character by money assessments, and of the fact that the future good of the cemetery may depend upon the harmonious co-operation of the community to which it was given, we feel justified in making the damages practically nominal.

*Decree reversed and cause remanded with mandate that a decree be entered appointing one trustee or three, as may be deemed advisable, to hold, manage and care for, under the direction of the court of chancery, the cemetery grounds designated in the opinion, with power to sell or assign to applicants lots therein, subject to such uniform rules regarding the individual care thereof as the trustee or trustees may adopt with the approval of the court of chancery; of the management of which trust annual report shall be made to the court of chancery at the June Term in each year.*

*And that the orators recover of the defendants fifty dollars damages, to be paid to the trustee or trustees for use in the future care of the cemetery; the matter of costs below being left to the determination of the court below.*

*And that the defendants be perpetually enjoined from cut-
ting or injuring the trees and shrubbery in the cemetery so des-
ignated, except as those interested in individual lots may do
this by permission of the trustee or trustees, or in caring for
such lots under the rules herein provided for.*